AMERICAN CAN COMPANY, Employer *v.*
Charles McCONNELL, Employee

CA 79-3                                    587 S.W. 2d 583

Opinion delivered August 8, 1979
and released for publication October 4, 1979

*Bethell, Callaway & Robertson*, by: *Donald P. Callaway*, for appellant.

*Youngdahl, Larrison & Agee*, for appellee.

JAMES H. PILKINTON, Judge. This cause was appealed to the Arkansas Supreme Court, and by that court assigned to the Arkansas Court of Appeals pursuant to Rule 29(3) of the Arkansas Supreme Court.

This is a workers' compensation case.

On August 2, 1972, appellee, Charles McConnell, was working on an air pressure line at his place of employment with appellant, American Can Company. The line blew off the machine, and the air pressure blew some foreign material into his right eye. The left eye was not involved. The following day, appellee was seen by Dr. Kenneth K. Wallace, an opthalmologist, who was unable to find any visible signs of injury. Subsequently, the appellee lost the vision in both eyes as the result of a medical condition known as macular edema. The macular edema developed in the left eye about a year after it appeared in the right eye, and is worse in the left eye. Appellee remained under the care of Dr. Wallace, but also consulted numerous specialists throughout the country.

Appellee asserted a claim for workers' compensation benefits. Following a hearing on June 4, 1977, an Administrative Law Judge denied the claim, and the claimant appealed to the Full Commission. In a two-to-one decision, the Full Commission found the claim compensable, and directed appellant to pay total permanent disability benefits and medical expenses. This appeal is taken from an order of the Sebastian County Circuit Court affirming the award.

Points relied upon by appellant are:

1. The Commission erred in finding any causal relationship between the job-related injury to the employee's right eye and his subsequent blindness from macular edema, and in finding that medical testimony is not required to establish the relationship.

2. The Commission erred in directing payment of all medical expenses related to the injury without determining whether such expenses were reasonably necessary for treatment.

It was stipulated that the date of the occurrence was August 2, 1972, at which time claimant's average weekly

wage was $138.00. Appellee contended that loss of vision in both eyes was the result of an injury on the stipulated date to the right eye, that he was entitled to permanent total disability benefits and medical expenses for treatment to his eyes. The respondent-appellant controverted these claims.

Following a hearing the Commission filed an opinion finding, among other things, that the appellee sustained a compensable injury to his right eye which resulted in the total loss of sight in both eyes, entitling appellee to compensation for permanent and total disability.

Under the Workers' Compensation Law as decided by the Arkansas Supreme Court on numerous occasions, the decision of the Commission must stand if supported by any substantial evidence. All disputed evidence must be viewed in the light most favorable to appellee. *Aluminum Co. of America v. Henning,* 260 Ark. 699, 543 S.W. 2d 480 (1976); *Jacob Hartz Seed Co.* v. *Thomas,* 253 Ark. 176, 485 S.W. 2d 200 (1972); *Southwestern Bell Telephone Co.* v. *Brown,* 256 Ark. 54, 505 S.W. 2d 207 (1974).

The question of having conclusive medical evidence has been considered by cases in Arkansas and from other jurisdictions and by Professor Larson in his treatise on workers' compensation. In Volume III, Section 79.51, Professor Larson states as follows:

"To appriase the true degree of indispensability which should be accorded medical testimony, it is first necessary to dispel the misconception that valid awards can stand only if accompanied by a definite medical diagnosis. True, in many instances, it may be impossible to form a judgment on the relation of the employment to the injury, or relation of the injury to the disability, without analyzing in medical terms what the injury or disease is. But this is not invariably so. *In appropriate circumstances, awards may be made when medical evidence on these matters is inconclusive, indecisive, fragmentary or even nonexistent.*" (Emphasis supplied.)

Professor Larson cites cases from several jurisdictions in a footnote to the above-quoted material, one of which is the Arkansas Supreme Court case of *Harris Cattle Co.* v. *Parker,*

256 Ark. 166, 506 S.W. 2d 118 (1974). In that case, an award to claimant for a back injury, described as a "bulging" intervertebral disc, was sustained despite absence of medical testimony establishing a causal relationship between the work and the injury.

Among other cases cited in support of the quoted material above, is the Georgia case of *Hartford Accident & Indemnity Co. v. Waters,* 87 Ga. App. 117, 73 S.E. 2d 70 (1953). In that case, the decedent who had had high blood pressure, fainted while sweeping a spinning frame, and died a week later of cerebral hemorrhage. There was no medical testimony expressing an opinion that this hemorrhage was contributed to by the exertion, but one doctor said that an exertion that might raise blood pressure also might precipitate a blood vessel rupture. The court held that this, plus knowledge from human experience that exertion is dangerous in such cases, was enough to support the award.

In the body of the treatise again at Section 79.51, Professor Larson quotes at length from a Rhode Island case in which the undisputed testimony of claimant showed that she had been struck a sharp blow on the nipple of the left breast by a bobbin, that about two weeks later a lump had formed at that exact spot and pus was beginning to come off, and that shortly after, on the advice of doctors, the breast was removed. The award was attacked on the grounds that there was no direct medical testimony fixing the pathological nature of the condition that necessitated the operation and no medical testimony connected the blow with the growth. Citing from the decision of the Supreme Court of Rhode Island, the court commented on the subject of the lack of medical testimony on causation as follows:

> "We can see that in the great majority of cases, such testimony ordinarily is necessary because of the seeming absence of connection between a particular accident and a claim resulting in injury. *But in other cases involving special and peculiar circumstances, medical evidence, although highly desirable, is not always essential for an injured employee to make out a prima facie case, especially if the testimony is adequate, undisputed and unimpeached.* Thus, where, as in the instant case, injury appears in a bodily member reasonably soon after an accident, and at the

very place where the force was applied and with symptoms observable to the ordinary person, there arises, in the absence of believed testimony to the contrary, a *natural inference that the injury*, whatever may be the medical name, *was a result of the employment.* " (Emphasis supplied.)

Appellant testified at the hearing that he was 54 years old and first went to work for the respondent in July, 1950. He stated that on the day of his accident, August 2, 1972, he was working on an air pressure line because some "trash and stuff" apparently had clogged the valves. He testified that he filled the line with mineral oil to lubricate the valves and, while in the process of working on the troubles, the air line blew off the machine, struck him in the right eye, and the force of the air pressure blew foreign material to his eye. The plant nurse washed out the eye and applied medication.

Appellant testified that he first saw Dr. Wallace for his condition on the day following the date of injury. He complained to Dr. Wallace that his vision was blurred in his right eye. Appellant testified that he had not had any problems with blurred vision or anything at all with his eye prior to the accident happening. He stated that he did wear glasses but had never had any eye injuries of any kind and had never seen a doctor for eye problems prior to the date. He had been examined approximately eight years earlier by an eye specialist who had found nothing wrong with appellant's eyes.

Appellant stated that he next saw a Dr. Faiser, at Holt-Krock Clinic several weeks after the accident because the condition in his right eye had not improved and, in fact, had grown continually worse. He testified that he went back to Dr. Wallace for treatment and next saw a Dr. Gass at the University of Miami in October, 1973. It was at this time that appellant testified that the problem also began taking his left eye. Appellant went on to testify that he had seen several specialists at different places in the country in an effort to obtain help for his eye condition. Reports from these various doctors were introduced as Claimant's Exhibits. Most of the reports were placed in the record for informational purposes since the doctors did not express any opinion in regard to the causal relationship between appellant's injury and his

blindness. In fact, the medical evidence can be narrowed to the opinions of Dr. Wallace, Dr. Jerry Wurster, Dr. William H. Campbell, Dr. Norbert Becquet and Dr. Faier.

Dr. Wallace testified by deposition in that case that, in his opinion, there was no causal relation between the appellant's eye condition and his subsequent blindness. Dr. Wallace did testify, however, at page 21 of his deposition that the cause of uveitis (the condition which results in the blindness) was not known. In his own words:

"Q. . . . What causes uveitis?

A. *The cause of uveitis is not known.*

Q. All right. So, the cause of macular edema is not known and the cause of uveitis is not known.

A. *That's right.* Uveitis is known to be associated occasionally with certain disorders, but it's not clear as to, you know, why they are associated together." (Emphasis supplied.)

Dr. Wallace went on to testify that he first saw appellant on August 3, 1972. He did not see any uveitis or macular edema. He did not see it when he examined claimant on the 9th of August, 1972, but, on August 11, 1972, he first detected the condition known as macular edema. He testified that it first appeared in the right eye, the eye in which claimant had had the injury.

Dr. Wallace went on to state that macular edema manifests itself by blurring your vision. He also stated as follows:

"Q. Does macular edema manifest itself by blurring of the vision?

A. Yes.

Q. And when he came in on August the 3rd, was he complaining of blurred vision?

A. Yes.

Q. In that eye?

A. Yes.

Q. Did he give you a history of having blurred vision in that eye prior to August 3, 1972?

A. No."

From a review of the above-quoted testimony, it appears without question that the onset of the claimant's condition which eventually spread to his left eye into eventual blindness did not appear until the day of the accident and, even according to Dr. Wallace's testimony, the exact cause of the condition which produced the blindness is not known. The testimony of the claimant must also be considered as to when his eye trouble started.

Dr. Wallace wrote a standard form surgeon's final report on November 16, 1972. This report appears as an exhibit to his deposition. In that report, indicating that he could make no determination either way concerning the cause of the macular edema, Dr. Wallace stated:

"Unable to determine (if) the cystoid macular edema is a result of on the job injury."

However, in his deposition, Dr. Wallace seemed to take a totally negative view toward any possibility of causal relationship, as is indicated by the following testimony:

"Q. Do you have an opinion, based upon reasonable medical certainty, as to whether the uveitis, or the macular edema, were caused or contributed by an allergic toxic reaction from any substance which might have gotten into his eye in the course of the industrial accident which he described to you on the date you first saw him?

A. In my opinion, the macular edema and uveitis that he

subsequently developed in both eyes is not related in any way to any toxic or allergic reaction from any chemicals that were introduced in the eye in the accident that he described to me.

And further:

Q. Do you have any opinion, based upon reasonable medical certainty, as to whether the macular edema was caused or contributed to by the industrial accident which he described to you as having occurred the day before you first saw him?

A. In my opinion, the accident did not cause or contribute to the macular edema."

Dr. Jerry Wurster wrote a report dated September 16, 1975. In that report he relates the history given to him by the claimant and then goes on to state as follows on the last page of his report:

"I would now like to address myself to the possibility of the patient's injury causing his uveitis. He has told me that all of the consultants he has seen in the past did not feel that these two are related, and I, at first, did not feel so either. *However, since we know so little about what causes peripheral uveitis and since I think his cystoid macular edema is secondary to that, one cannot rule out the possibility of the injury being related to the onset of his peripheral uveitis.* I am not indicating that there is a direct cause and effect, but I am just implying the possibility that perhaps there is a reasonable chance that the two could be related." (Emphasis supplied.)

Dr. William H. Campbell stated in his report which appears as a Claimant's Exhibit, as follows:

"I feel that Dr. Wurster's statement is made in good faith. There is no known connection of his type of injury with this type of medical problem of the eye. However, no one can completely rule out or rule in the coincidental occurrence and *there is always a possibility that an injury*

*to an eye can cause inflammation.*" (Emphasis supplied.)

Finally, the report from Dr. Norbert Becquet was submitted as part of the record subsequent to the hearing. Dr. Becquet examined the claimant and reviewed all of the medical reports which had been written — Dr. Becquet states in his report, dated September 14, 1977, as follows:

> "In my opinion this onset of flare and cells within the globe is probably more due to an allergic toxic reaction from the solution than from trauma, for he certainly would not have been examined for glasses just after trauma to the eyes.
>
> An allergist I spoke to about doing sensitivity tests with the compounded lubricating solution said he would rather not do so; it might trigger a reaction and cause further loss of the vision he has.
>
> The other ocular complications which are many are certainly possible secondary to the intraocular flareups following the spilling over the compounded lubricating solutions onto the anterior global areas."

Dr. Becquet seems to have discounted the possibility of trauma to the eye, but concludes:

> ". . . One should certainly consider as a *probable* cause of the uveitis an allergic reaction to the compounded lubricating solutions to the air hose which pulled loose." (Emphasis supplied.)

In this case the evidence as a whole would no doubt have supported a contrary finding; but, that is not the test on appeal. *Meador Lumber Co.* v. *Wysong*, 262 Ark. 425, 557 S.W. 2d 395 (1977). The question here is whether there is any substantial evidence to support the Commission's findings. If so, its decision must be affirmed. *Dillaha Fruit Co.* v. *LaTourrette*, 262 Ark. 434, 557 S.W. 2d 397 (1977).

Under the substantial evidence rule aforesaid appellant shoulders a heavy burden in seeking, as here, reversal of the

Commission's decision upon an issue of fact. *Plastic Research & Development Co.* v. *Goodplaster,* 251 Ark. 1029, 476 S.W. 2d 242 (1972). On appeal from awards made by the Workmen's Compensation Commission, doubtful cases are always resolved in favor of claimant. *Cooper Industrial Products, Inc.* v. *Worth,* 256 Ark. 394, 508 S.W. 2d 59 (1974).

The medical soundness and probative force of the various doctor's testimony was for the Commission, and a reviewing court is not at liberty to determine such matters. *Barksdale Lumber Co.* v. *McAnally,* 262 Ark. 379, 557 S.W. 2d 868 (1977).

On review, this court looks to see if there is any substantial evidence to support the findings of the Commission; all inferences must be resolved against the employer, and the evidence is given the most liberal construction possible in favor of the worker. *Foster* v. *Johnson,* 264 Ark. 894, 576 S.W. 2d 187 (1979).

Applying these well known rules, we must sustain the finding of the Workmen's Compensation Commission in this case.

As to appellant's second point, we do not think it was unreasonable for appellee to seek out all of the medical advice and attention he could get. This man was losing his eyesight. He appears to have been motivated by a desire to find a doctor who could help save his sight. There is no testimony that all the physicians consulted attempted an expensive course of treatment of his condition for which the employer must pay. There was no evidence of double, conflicting, unnecessary or extended treatment. We find no error in the Commission directing appellant to pay "all medical expenses related to claimant's compensable injury."

The case is therefore affirmed in all respects.

HAYS, J., dissents.

M. STEELE HAYS, Judge, dissenting. I cannot agree that the commission should be affirmed. The opinion of the Com-

mission that appellee's macular edema and uveitis were attributable to an injury incurred within the scope of his employment cannot, I believe, he sustained by the evidence, even when considered in a light most favorable to the appellee. The medical evidence from numerous opthamologists was that the cause or causes of macular edema and uveitis has not yet been isolated, though some, perhaps most, believe it to be vascular in origin. Claimant relies on the medical opinion of Dr. Jerry V. Wurster, Dr. William H. Campbell, and Dr. Norbert J. Becquet. The pertinent portion of Dr. Wurster's opinion is:

> "However, since we know so very little of what causes peripheral uveitis and since I think his cystoid macular edema is secondary to that, one cannot rule out the possibility of injury being related to the onset of his peripheral uveitis. I am not indicating that there is a direct cause and effect, but I am just implying the possibility that perhaps there is a reasonable chance that the two could be related."

(It should also be observed that Dr. Wurster was mistaken in the sequence of the onset of disease as he erroneously assumed that the uveitis preceded the cystoid macular edema, which was clearly not the case.)

Similarly, Dr. Campbell stated:

> "There is no known connection of his type of injury with this type of medical problem of the eye. However, no one can completely rule out or rule in the coincidental occurrence and there is always a possibility that an injury to an eye can cause inflammation."

Obviously, neither of these guarded and cautious opinions (both of which are couched in terms of "possibility" rather than "probability") meet the requisites of substantial medical evidence. Dr. Becquet's testimony came closer to meeting the test when he stated:

> "One should certainly consider a probable cause of the onset of uveitis and allergic reaction to the compounded

lubricating solutions in the air hose which pulled loose."

The problem with Dr. Becquet's comment is that he makes a mistake of fact that is fatal to his opinion when he assumes that *both eyes* were involved in the initial episode on August 3, 1972. The report of Dr. Becquet at pages 39 and 40 of the abstract makes it clearly evident that Dr. Becquet's opinion is founded on the lubricating solution being introduced into both eyes when in fact it is undisputed that only the right eye of the appellee was involved.

Against this inconclusive medical testimony is the testimony of the claimant's own physician, Dr. Kenneth Wallace, also a opthamologist. Dr. Wallace examined the claimant on the day following his initial injury and both treated and examined the claimant over a period of several years. By actual count, Dr. Wallace saw the claimant not less than 97 times from the initial episode and as recently as November 8, 1977. Obviously, the claimant had a high degree of confidence in Dr. Wallace. Dr. Wallace testified unequivocably that in his opinion there was no relationship between the August 3, 1972 injury and the pathology of the claimant's vision loss. Specifically, Dr. Wallace stated:

"The significance of that to me is that as time went on, it began to become clear that we were dealing with a bilateral condition affecting both eyes, which could not and would not be related to any trauma in one eye only." ["In my opinion, the macular edema and uveitis that he subsequently developed in both eyes is not related in any way to any toxic or allergic reaction from any chemicals that were introduced to the eye in the accident that he described to me."]

Appellee relies on *Harris Cattle Company* v. *Parker*, 256 Ark. 166, 506 SW 2 118 and *Hartford Accident and Indemnity Co.* v. *Waters*, 73 SE 2d 70 as well as Larson 79.51. Professor Larson cites the case of *Valente* v. *Bourne Mills*, 77 R.I. 274, 75 Atl. 2 191. These cases hold that medical evidence "in appropriate cases" is not always required. A portion of Professor Larson's commentary reads:

"We can see that in the great majority of cases, such testimony ordinarily is necessary because of the seeming absence of connection between a particular accident and a claim resulting in injury. *But in other cases involving special medical evidence, although highly desirable, is not always essential for an injured employee to make out a prima facie case, especially if the testimony is adequate, undisputed and unimpeached.*"

I have no difficulty with this principle; I cannot, however, agree that it has any application to the case at bar. In these cases there was no medical evidence on either side concerning causation, whereas in the present case Dr. Wallace and others stated emphatically that the injury and the result could not be related. Too, in the cases cited, the injury and its progress had a rather clear anatomical correlation, concerning which common experience gives some guidance, whereas in the case at bar the disease is highly complex and of unknown origin.

I don't believe Professor Larson and the rationale of these cases should be extended to apply to facts presented in this case. I would reverse and dismiss.