ANCHOR CONSTRUCTION COMPANY, EM-PLOYER, MARYLAND CASUALTY COMPANY, INSURANCE CARRIER v. ALBERT RICE, EMPLOYEE

5-5728                                         479 S.W. 2d 573

Opinion delivered May 1, 1972

[Rehearing denied May 29, 1972.]

*Pearson & Pearson,* for appellants.

*R. H. Mills,* for appellee.

CONLEY BYRD, Justice. Albert Rice sustained a broken leg while working for Anchor Construction Company. The healing period was complicated by a fat embolism which resulted in some temporary difficulty in breathing. Admittedly Rice was left with a resulting angulation of his left leg which the only medical witness evaluated as a 15% permanent partial disability to the left lower extremity from the hip down. Rice claimed and produced some evidence to show a wage earning loss. The Workmen's Compensation Commission awarded a 25% disability to the left lower leg under the scheduled injury section, Ark. Stat. Ann. § 81-1313 (c) (Repl. 1960). Both parties have appealed. Rice contends that there is substantial evidence in the record to support an award of permanent partial disability to the body as a whole, up to 50%. Anchor Construction contends that any award for the scheduled injury in excess of the 15% functional disability to the left lower extremity is contrary to law.

Rice testified that he was 49, had only a fourth grade education and his job experience was as farm labor, sawmill work, truck driving and some rough carpenter work. He had a lump in his throat where the tracheotomy was performed, his left foot angled out and swelled and hurt when he stood on it for a long period. He could no longer do logging and timber work because of his foot and could not do carpenter work because of his inability to climb ladders. He was making $2.00 per hour and averaging 60 hours per week with a total income of $140.00 per week before the accident. He is now averaging $42.00 per week working at a sawmill where the boss lets him sit down when he is tired. He had worked only one 40 hour week between Christmas and the hearing in April. He testified that his sinus and ulcers were problems of general health. He was making a claim for a loss of hearing because of a buzzing noise.

Dr. Carl M. Kendrick testified that when he first saw Rice on January 29, 1968, his condition was critical. Rice has a broken leg which was complicated by a fat embolism. He did a tracheotomy and Rice had a full and complete recovery from the fat embolism and the tracheotomy. He did not make any tests to determine if Rice had suffered brain damage or hearing loss. The biggest test, however, is conversing and talking with the patient and based upon his observation, Rice had made a complete recovery. It was also inconceivalbe to him that Rice would have had a hearing loss that would not have healed on its own.

Dr. Kendrick, in rating Rice as having a 15% functional disability to the left lower extremity below the hip, took in consideration the angulation of Rice's foot, that he could not do everything required of him in his usual line of work, that weight bearing for a long period of time will cause swelling and that at intervals he will have pain and swelling in his leg for the rest of his life.

As we view the record the Commission properly found that there was no permanent disability to any part of the body except the left lower extremity below the hip. Of course this reduces the permanent injuries to a scheduled injury under Ark. Stat. Ann. § 81-1313 (c). In *Moyers Brothers* v. *Poe,* 249 Ark. 984, 462 S.W. 2d 862 (1971), we held that an injury scheduled under Ark. Stat. Ann. § 81-1313 (c) could not be apportioned to the body as a whole in determining the extent of permanent partial disability as distinguished from permanent total disability. See *McNeely* v. *Clem Mill & Gin Co.,* 241 Ark. 498, 409 S.W. 2d 502 (1966).

We now come to the issue of whether the Commission in fixing partial loss or partial loss of use of a limb under schedule (c) can consider a wage earning loss in addition to the functional loss. We hold that they cannot. The reason for construing statutes, such as ours, in this manner is set forth in Larson, *Workmen's Compensation* § 58.10 in this language:

"Schedule benefits for permanent partial disability are authorized by the statutes of all American jurisdictions, but not under Canadian laws.

"The typical schedule provides that, after the injury has become stabilized and its permanent effects can be appraised, benefits described in terms of regular weekly benefits for specified numbers of weeks shall be paid, ranging, for example, from 312 weeks for an arm, 288 for a leg, and 160 for an eye to 38 for a great toe and 7½ for one phalange of the little finger. Thses payments are not dependent on actual wage loss. Evidence that claimant has had actual earnings, or has even been regularly employed at greater earnings than before, is completely immaterial.

"This is not, however, to be interpreted as an erratic deviation from the underlying principle of compensation law—that benefits relate to loss of earning capacity and not to physical injury as such. The basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively. presumed one, instead of a specifically proved one based on the individual's actual wage-loss experience. The effect must necessarily be a presumed one, since it would be obviously unfair to appraise the impact of a permanent injury on earning capacity by looking at claimant's earning record for some relatively short temporary period preceding the hearing. The alternative is to hold every compensation case involving any degree of permanent impairment open for a lifetime, making specific calculations of the effects of the impairment on claimant's earnings each time claimant contends that his earnings are being adversely affected. To avoid this protracted administrative task, the apparently cold-blooded system of putting average-price tags on arms, legs, eyes, and fingers has been devised."

Since the Commission obviously used the wage earning loss to arrive at an award in excess of 15% to the left lower extremity below the hip, it follows that the

Commission erred in entering an award in excess of the 15% functional loss.

It has been suggested that perhaps Rice would be entitled to some relief under Ark. Stat. Ann. § 81-1313 (b) (Repl. 1960), which provides:

> "In case of temporary partial disability resulting in the decrease of the injured employee's average weekly wage, there shall be paid to the employee sixty-five per centum [65%] of the difference between the employee's average weekly wage prior to the accident and his wage earning capacity after the injury."

However, as we interpret subsection (b) the term "temporary partial disability" refers to the phase of permanent partial disability where the employee, although able to work at some gainful occupation, is still suffering from the effects of the injury, which effects may reasonably be anticipated to disappear within the time fixed for compensation. Here the evidence shows that Rice's injuries had become fixed by December 5, 1969.

Reversed and remanded.

J. FRED JONES, Justice. I agree with the majority that this case must be reversed but it is not as obvious to me, as it appears to the majority, that the commission based its award of 25% loss in the use of Rice's injured leg on a wage earning loss. It is my feeling that in the light of Mr. Rice's testimony as to what he could and could not do as well after his injury as before, the Commission may well have concluded that Dr. Kendrick was low in his estimate that Rice only had a 15% loss in the use of his leg. Dr. Kendrick testified, however, that he took into consideration the elements testified to by Mr. Rice in arriving at his estimate of 15%. I agree there is no substantial evidence to support an award greater than the 15% testified to by Dr. Kendrick. If the Commission felt that Mr. Rice did suffer a greater loss in the use of his leg than the 15% estimated by Dr. Kendrick, the Commission should have ordered additional medical examinations as it had a right to do under the statute. [Ark.

Stat. Ann. §§ 81-1311 and 1319 (i) (Repl. 1960)].

We are concerned here with the *loss in the use* of a body member scheduled under subsection (c) and I agree that the amount payable is fixed by statute. I also agree that an injury scheduled under Ark. Stat. Ann. § 81-1313 (c) (Repl. 1960) cannot be apportioned to the body as a whole and that we laid that question to rest in *Moyers Brothers* v. *Poe*, 249 Ark. 984, 462 S.W. 2d 862 (1971). It is my opinion, however, that the case at bar calls for a clear distinction between *permanent* disability and just plain disability when both may result from injuries scheduled under subsection (c).

The main purpose, if not the only one, in attempting to predetermine the permanency of disability in terms of percentage of total disability, is for the purpose of lump sum settlements. Such purpose and attempt are entirely legitimate and proper under the statute when, but *only* when, the disability is definitely *permanent*, and it is in this difficult area that most of the litigation arises in workmen's compensation cases. The case at bar presents the interesting question of law as to whether an employee, who sustains a compensable injury scheduled under subsection (c), may receive compensation for wage loss disability in addition to the amount payable for a permanent loss scheduled under subsection (c). In *McNeely* v. *Clem Mill & Gin Co.*, 241 Ark. 498, 409 S.W. 2d 502 (1966), we said that he can, and in the case at bar, as I interpret the majority opinion, we say that he cannot unless the disability is total.

In *McNeely, supra,* the claimant sustained a scheduled injury resulting in the total loss of his leg below the knee and was paid the maximum benefits for his *permanent* disability as fixed by statute under schedule (c) amounting to 125 weeks compensation. After the loss was determined and McNeely was paid the statutory amount under subsection (c), he was still on crutches and unable to work and filed a *claim* for additional benefits. The Commission found him to be totally disabled but very properly refused to "guess" as to how *permanent* his total disability would be, and simply awarded compensation for total disability and we affirmed. We have no further record of what happened in McNeely's case

but if he continued to be *totally* disabled until he was paid the maximum compensation benefits payable for total disability, the duration of his compensable disability and the total amount he received amounted to exactly the same as for permanent total disability, the only difference being in the manner which the payments were made. McNeely could only have been paid in weekly payments during the course of his total disability and could not be paid in one lump sum for *permanent* disability over and above the 125 weeks for the permanent loss of his leg below the knee under schedule (c).

In the case at bar the claimant-appellee Rice's injury was under exactly the same schedule as was McNeely's. The only difference in the two injury losses is that McNeely sustained a *total* loss of the leg below the knee, and Rice sustained a *partial* loss of use of the entire leg. As already pointed out, subsection (c) is the only provision for *permanent* disability in a scheduled injury, and the amount set opposite each scheduled injury in subsection (c) is the maximum amount payable for *permanent* disability as a result of such injury; a maximum of 175 weeks in the case at bar and 125 weeks in McNeely.

Now if Rice's partial loss of use of his leg had rendered him totally unable to work at gainful employment, he would be entitled to continued total disability benefits under our decision in *McNeely*. But what of Rice's situation if because of his scheduled injury, he had only been able to earn one-fourth the wages he earned prior to his injury? Under the majority opinion as I interpret it, he could receive nothing in addition to 15% of 175 weeks for the loss in the use of his leg. What of McNeely had he not been *totally* disabled from gainful employment but only 75 or 80% disabled? Under the majority opinion as I interpret it, he could receive nothing in addition to the 125 weeks he received under schedule (c).

McNeely was awarded total disability under the first sentence of § 81-1313 (a) which is as follows:

"In case of total disability there shall be paid to

the injured employee during the continuance of such total disability sixty-five per centum [65%] of his average weekly wages. . ."

I agree that in the case at bar, Rice did not prove a loss in earnings caused by his injury but had he done so, or if McNeely had proven a *partial* wage loss because of the injury in his case, it is my opinion that both should have been compensated under § 81-1313 (b) which is as follows:

"In case of temporary partial disability resulting in the decrease of the injured employee's average weekly wage, there shall be paid to the employee sixty-five per centum [65%] of the difference between the employee's average weekly wage prior to the accident and his wage earning capacity after the injury." [1]

In *Moyer Brothers* v. *Poe, supra,* we said:

"If the employee's earning capacity has been *diminished* or *destroyed* by such permanent partial disability [from a scheduled injury under (c)], he *may* be entitled to workmen's compensation benefits *even to the extent of permanent total disability.*" (Emphasis and bracketed portions added).

Thus, subsection (a) is the only section of the statute under which compensation may be awarded for just *total* disability and subsection (b) is the only provision of the statute under which compensation may be awarded for just *partial* disability. Subsection (b) is as valid as subsection (a) and I am unable to see how an injured employee, who has suffered a permanent injury under subsection (c), can be entitled to total disability benefits under subsection (a) and not be entitled to partial disability benefits under subsection (b), if and when the factual evidence in a given case would justify an award of such benefits. Under the facts as presented by the evidence in this case, I concur in the reversal.

---

[1] This section as originally enacted in 1939 and adopted under referendum in 1940, limited temporary partial disability benefits to 350 weeks or $7,000.00. This limitation was eliminated when the section was amended in 1949 to its present form by initiated Act No. 4 of 1949.