COOPER INDUSTRIAL PRODUCTS, Inc. *v.*
Delona Pauline WORTH

73-288 508 S.W. 2d 59

Opinion delivered April 15, 1974

*Brown, Compton & Prewett,* by: *Wm. I. Prewett,* for appellant.

*Shackleford & Shackleford,* by: *Norwood Phillips,* for appellee.

LYLE BROWN, Justice. This is a workmen's compensation case. The crucial question is whether an injury to the right knee rendered claimant permanently and totally disabled. Appellant contends (1) that there is no substantial evidence to support the commission's finding of total and permanent disability, (2) that claimant received a scheduled injury which cannot be related to the body as a whole, and (3) that under the facts in the case claimant is limited to an award of $19,500, based on the theory that if she is permanently disabled, it was caused by a succession of injuries.

Appellee-claimant began working for appellant in 1964 as an assembly line worker. During that employment she sustained four job-related injuries. On July 6, 1964, she sustained a compensable injury which resulted in the removal of her left index finger. Upon return to work she was taken off the assembly line and began working as an inspector. On April 17, 1967, claimant sustained a second compensable injury to her neck. Her permanent disability was rated at 10% to the body as a whole. The claim was joint petitioned. Then on March 9, 1970, she sustained an injury to the right knee which resulted in a disability of 40% to her right lower extremity. Claimant was off the job for about one year. Because of that injury claimant wears a brace which attaches to her upper thigh and extends to her instep. The brace is stiff and causes claimant to walk with her leg in a locked position. In order to sit, stoop, or bend, she disengages a latch on the brace. When she arises the latch is reengaged so she can walk. About two months after her return to work she suffered a fall and was off work four days. Shortly after that fall she

was terminated by appellant, it being considered hazardous to herself and her fellow·employees for her to continue working.

The commission adjudged claimant to be totally disabled as a result of the knee injury of March 9, 1970. Alluding to the previous injuries the commission said: "It is true claimant sustained other injuries which were anatomically disabling. However, these prior injuries were not disabling in the compensation sense. Disability means incapacity because of injury to earn. Claimant testified that she was able to do her work and earn her way after her two previous injuries but could not do so after the third injury." The commission also declined to limit recovery to $19,500 on the theory that the limiting statute was not applicable because her disability was a result of only the one injury. That finding had reference to Ark. Stat. Ann. § 81-1313 (f) (1) (Repl. 1971), which placed a ceiling on recovery when permanent total disability results from previous and subsequent injuries.

We proceed to examine the testimony to ascertain whether there is any substantial evidence to support the judgment of the commission in its finding that claimant was totally and permanently disabled because of the injury to the right leg.

*Delona Pauline Worth.* She is forty-one years old and lives in El Dorado. She dropped out of school before finishing the eighth grade and went to work when she was twelve years old washing dishes at a hospital where she worked for seven years. She was promoted to nurse's aide, giving baths, making beds, and attending to patients. When she left the hospital she went to work at Wood Manufacturing Company on the assembly line, doing work similar to her work for appellant. After working there seven years she worked briefly at two other places, both involving manual labor. In 1964 she went to work for appellant and did assembly line work, machine work, and inspection with the latter being her main job. "An inspector examines rubber car parts for possible defects. While inspecting, you can sit down part of the time and you can stand up part of the time. It does involve some stooping and squatting."

Before going to work for appellant she had never suffered an injury and was in good health. (She then described the four accidents which we have heretofore related.) Following the injury to the right knee she was examined by Dr. Callaway and Dr. Sheppard of El Dorado and by Dr. Kenneth Jones of Little Rock, all at the instance of appellant. She now wears a long leg brace prescribed by Dr. Callaway. It is impossible to walk without the brace or a crutch. The stiffness in her knee causes the other leg and back to ache "when I am on my feet very much". She has no skills except hospital work and manufacturing work and does not feel physically able to do either one. She wears the brace at all times except when sleeping. Her husband helps with the housework.

*Royce F. Worth.* He is claimant's husband. Before the described injuries his wife was able to help him roof the house and in plumbing. If claimant is on her feet very much around the house she complains of her leg and back. In doing her housework she has to sit down and rest quite often. "Presently I do all of her mopping and help her as much as I can in other ways around the house. I must do much more of the housework since this last injury."

*Ronald Murphy.* This witness is an employment counselor for the Arkansas Security Division. He evaluates job applicants and determines if there are jobs available for which they might be suited. He had never interviewed claimant and would be unable to say whether she could be retrained without more information. There are three employers in El Dorado who employ primarily women, basically assembly line work. "This assembly line work involves some stooping, lifting or bending but basically requires employees to use their hands and fingers at a rapid rate of speed." Most of the work requires prolonged standing in one area. Anyone with a seventh grade education is not generally considered good rehabilitation material.

On cross-examination he recalled other businesses in the area which employ large numbers of women. Those companies have women employed as PBX operators. The jobs require a little more than normal intelligence. Some such operators must have a high school education — others do not.

The fact that claimant worked up to an inspector would indicate that she had a little more intelligence than others working on the assembly line; however, without further information he could not say whether claimant was retrainable.

*Dr. Kenneth G. Jones.* He saw claimant professionally in August 1971, more than a year after the knee injury. She was sent to him at the request of appellant. The doctor was called to testify on behalf of claimant.

Q. Dr. Jones, you expressed the opinion that she was totally disabled from engaging in gainful employment. Did you attribute that to the leg injury or to a conglomerate of all her problems of industrial injuries?

A. It's a conglomerate of all of them, although, I don't think she could be able to work with her leg injury itself.

Q. As far as you are concerned, were she a whole woman except for the leg and the leg was in the condition that it is in, is it your opinion that she would be permanently disabled?

A. It's my opinion she wouldn't go back to work, yes.

Q. Why is that, Doctor Jones?

A. Well, this woman has had a series of accidents which suggests she is somewhat accident prone, if we could use such a term as that, and I think the leg in itself, in that she had enough disability in her right leg, with a flexion contracture of her right knee, that I don't see how in the world she could carry on as an active person in a demanding type labor job. Now, if she were a white collar worker sitting at a table I assume she could work some but not at labor.

In cross-examination Dr. Jones conceded that he considered all of claimant's injuries in the total picture and that with all these injuries she was not able to perform manual labor. He qualified his "conglomerate" statement by reiterating that claimant could not work because of the condition of her leg. He went so far as to say he would not hire clai-

mant for a job simply requiring sitting.

*Dr. J. C. Callaway.* The doctor treated claimant two days after the injury to the knee and continued to treat her for a full year. He is the doctor who fitted claimant with the leg brace. As late as three months after the accident the doctor expressed the opinion that claimant "would prefer to remain crippled" than subject herself to surgical suggestion. In his last report a year after the accident the doctor gave this report:

> The examination of March 15, 1971, revealed there is still thirty degrees flexion contracture of the knee. The knee flexes to ninety degrees, X-rays taken show some osteoporotic changes in the distal femur. There is no evidence of extra-articular calcification. Since her condition has remained static over many months, I feel that her disability is equal to forty percent of the right lower extremity. She is being discharged at this time. The patient could resume employment provided that stooping, squatting or excessive climbing are not involved . . .
> She would be suited for a standing type job, such as on an assembly line, and would not be able to perform duties which involve more than a minimal amount of bending, lifting, stooping, squatting or climbing.

Dr. Callaway fixed claimant's disability at 40% of the right lower extremity.

*Dr. Jack Sheppard.* The doctor examined claimant on June 2, 1971, at the instance of appellant and concluded his report with this impression:

> This patient sustained an injury of the knee causing a flexion contracture of the right knee which appears to be permanent. Due to weakness of the ligaments of the knee, it is necessary for her to wear a brace while at work. It is my opinion that she is unable to fulfill her duties which she is presently assigned and that she is not eligible for employment by the standards of the Cooper Company. Because of the weakness and pain that she suffers from this leg, it is also my opinion that it would be hazardous for her to return to her employment, both to herself and her fellow workers.

In that same report Dr. Sheppard commented on the loss of the finger and the injury to the neck. "She has an amputation of the first finger of the left hand. The wound is healed well and appears to be no disability at the present other than the loss of the finger. There is slight stiffness of the neck, but does not appear to be causing any disability at the present time."

The findings of the commission have the same binding force as a jury verdict. On appeal we give those findings the strongest probative force in favor of the commission. *American Casualty Co.* v. *Jones*, 224 Ark. 731, 276 S.W. 2d 41 (1955). Doubtful cases are resolved in favor of the claimant. *Hixson Coal Co.* v. *Furstenberg*, 225 Ark. 568, 284 S.W. 2d 120 (1955). With the recited applicable rules in mind, and applying them to the facts which we think we have fairly abstracted, we conclude that the finding of the commission as to total and permanent disability is supported by substantial evidence.

Appellant contends that claimant's injury to the knee is a scheduled injury under Ark. Stat. Ann. § 81-1313 (c) (Repl. 1960) and cannot be related to the body as a whole. The contention is answered by *Meadowlake Nursing Home* v. *Sullivan*, 253 Ark. 403, 486 S.W. 2d 82 (1972):

> The appellants' main contention for reversal is based upon the testimony of Dr. Grimes, the claimant's physician, who evaluated her medical disability as a 40% impairment of the left leg as a whole. There is no medical testimony indicating any greater impairment. In *Anchor Constr. Co.* v. *Rice*, 252 Ark. 460, 479 S.W. 2d 573 (1972), we held that the Commission, in fixing a partial disability resulting from an injury scheduled in Ark. Stat. Ann. § 81-1313 (c) (Repl. 1960), cannot consider a wage-earning loss in addition to the physical functional loss. Upon the basis of that decision the appellants argue that the Commission erred in allowing anything more than the scheduled compensation for a 40% functional impairment of one leg.
>
> That contention misconceives the basis for our holding in the *Anchor Construction Company* case. There we were considering only a partial disability under Subsection

(c) of Section 81-1313, *supra*. That subsection provides fixed compensation which covers the functional loss and the wage-earning loss. But Subsection (a) provides a different rule with respect to total disability, which is to be determined "in accordance with the facts." We held in *McNeely* v. *Clem Mill & Gin Co.*, 241 Ark. 498, 409 S.W. 2d 502 (1966), that a scheduled injury may give rise to an award of compensation for total disability under Subsection (a). *McNeely* was not overruled by *Anchor Construction*, because the wording of Subsection (a) is more liberal than that of Subsection (c). The McNeely case is identical in principle with the case at bar and fully sustains the decision of the Commission.

Finally, appellant argues that the second injury provision of our compensation statutes applies in this case. Ark. Stat. Ann. § 81-1313 (f) (1) (Supp. 1971) provided, among other things: "When the previous and subsequent injuries received result in permanent total disability, compensation shall be payable for permanent total disability, but the sum total of compensation payable for previous and subsequent injuries shall not exceed 450 weeks or nineteen thousand five hundred dollars ($19,500.00)." The commission held that the provision does not apply in this case. Since there was substantial evidence that claimant's total disability arose solely from the knee injury, we agree with the commission.

Affirmed.

HARRIS, C.J. and JONES, J., dissent.

J. FRED JONES, Justice, dissenting. As I view this case, the crucial question is whether a 40% loss in the use of a leg because of a knee injury can render a claimant entitled to compensation benefits for *permanent* total disability under the statutory law as it now stands.

The claimant in this case sustained an injury to her knee resulting in a 40% disability, or loss in the use of her right lower extremity. The claimant wears a prescribed brace on the right leg. It is necessary to keep the brace in a locked position when walking, and it is necessary to disengage a latch on the brace in order to bend her knee. Because the medical doc-

tors have said they do not think the claimant will be able to work because of the leg injury. the Commission found the claimant to be *permanently* and *totally* disabled and this court has affirmed.

As I interpret the effect of the majority opinion, it means that from now on in Arkansas if an employee sustains a compensable injury to a leg, foot, arm or hand, or to any other member of the body, and can produce medical evidence to the effect that the injured employee is accident prone, and because of such injury should not attempt to work in the future, if an award of *permanent total* disability should be made by the Commission, it should be affirmed by the circuit court and by this court on appeal.

It is my opinion that the Legislature made clear and specific allowances for just such a situation in the pvovisions of Ark. Stat. Ann. § 81-1313 (c) (Repl. 1960). This section has been referred to and quoted so often in our decisions it should not be necessary to repeat it here, but I shall do so one more time. This section provides as follows:

> "An employee who sustains a permanent injury scheduled in this subsection shall receive, in addition to compensation for the healing period, sixty-five per centum [65%] of his average weekly wage for that period of time set out in the following schedule:
>
> \* \* \*
>
> (3) Leg amputated at the knee, or between the knee and the hip, one hundred seventy-five [175] weeks;
>
> \* \* \*
>
> (21) . . . Compensation for permanent total loss of use of a member shall be the same as for amputation of the member;
>
> (22) . . . Compensation for permanent partial loss or loss of use of a member shall be for the proportionate loss or loss of use of the member."

Now, subsection (d) under § 81-1313 pertains to "Other cases" (not scheduled) and provides as follows:

"A permanent partial disability not scheduled in subsection (c) hereof shall be apportioned to the body as a whole, which have a value of 450 weeks, and there shall be paid compensation to the injured employee for the proportionate loss of use of the body as a whole resulting from the injury."

The Commission as well as the majority of this court in reaching the results reached in this case, apparently reverted back to subsection (a) of § 81-1313 pertaining to total disability, which reads as follows:

"In case of total disability there shall be paid to the injured employee during the continuance of such total disability sixty-five per centum [65%] of his average weekly wages. Loss of both hands, or both arms, or both legs, or both eyes, or of any two [2] thereof shall, in the absence of clear and convincing proof to the contrary, constitute permanent total disability. *In all other cases, permanent total disability shall be determined in accordance with the facts.*" (Emphasis added).

As I interpret the above statutory provisions, subsection (a), including the last sentence above emphasized, relates to subsection (d), *supra,* and pertains to permanent partial disability *not scheduled* in subsection (c).

I certainly feel that if an injured employee loses a leg as a result of an industrial injury, and because of such injury is no longer able to earn the same wages in the same or other employment, he should be compensated for his loss in wage earning capacity *as long as it lasts,* in addition to the permanent disability he is entitled to under a scheduled injury. My view in this connection was rejected by the majority in *Anchor Constr. Co.* v. *Rice,* 252 Ark. 460, 479 S.W. 2d 573. In *Anchor* the injured employee sustained a scheduled injury resulting in some permanent disability to his left leg below the knee. The medical evidence sustained a 15% disability to the leg. The claimant contended that he was entitled to a permanent partial disability in the amount of 50% to the body as a

whole, and the respondent contended that he was only entitled to the 15% functional disability found by the doctor. The Commission awarded 25% permanent partial disability to the leg. I dissented in that case but in the majority opinion this court said:

"As we view the record the Commission properly found that there was no permanent disability to any part of the body except the left lower extremity below the hip. Of course this reduces the permanent injuries to a scheduled injury under Ark. Stat. Ann. § 81-1313 (c). In *Moyers Brothers* v. *Poe*, 249 Ark. 984, 462 S.W. 2d 862 (1971), we held that an injury scheduled under Ark. Stat. Ann. § 81-1313 (c) could not be apportioned to the body as a whole in determining the extent of permanent partial disability as distinguished from permanent total disability. See *McNeely* v. *Clem Mill & Gin Co.*, 241 Ark. 498, 409 S.W. 2d 502 (1966).

We now come to the issue of whether the Commission in fixing partial loss or partial loss of use of a limb under schedule (c) can consider a wage earning loss in addition to the functional loss. We hold that they cannot."

I agree that total disability may result, and many times does result, from a scheduled injury, and that the injured employee should be paid compensation benefits so long as he is totally disabled because of the scheduled injury. But when it comes time to determine and award benefits for *permanent* injury, I part with the majority in my interpretation of the statute. I do so in spite of the *obiter dictum* in *McNeely* v. *Clem Mill & Gin Co.*, 241 Ark. 498, 409 S.W. 2d 502, which the majority, in the case at bar, has apparently adopted as the law in Arkansas. The *obiter dictum* referred to appears as a part of the statement in *McNeely* as follows:

"The principal question is whether an employee who suffers a scheduled injury which proves to be totally and permanently disabling is entitled only to the restricted compensation specified for the scheduled injury or to the greater benefits provided for total and permanent disability. The commission took the more liberal view, but its award was set aside by the circuit court. We agree with the commission."

In the *McNeely* case we only know that the claim was for *additional benefits* after the claimant had been paid the full statutory period of 125 weeks for the loss of his leg. Certainly the full payment of scheduled permanent disability under subsection (c) should not prevent reinstatement of benefits for *total* disability within the statutory period for reopening or for change in condition. I find no fault with the results on the facts in *McNeely* but the majority in the case at bar have reached the conclusion, which we appeared to invite but refused to express in *McNeely*, for in that case this court said:

"The appellees complain of the fact that the commission, in finding this claimant's disability to be total, failed to find that it was also permanent. Instead the commission said that the duration of the disability is not determinable at this time. Inasmuch as there was substantial evidence that might have sustained a finding of permanency — a fact issue upon which we express no opinion — we fail to see how appellees are hurt by the commission's deferment of this question until the exact extent of the disability might become clearer."

The case of *Meadowlake Nursing Home* v. *Sullivan,* 253 Ark. 403, 486 S.W. 2d 82, is no precedent for the conclusion reached by the majority in the case at bar for the reason that in *Meadowlake* the medical evaluation was a 40% impairment of the left leg as a whole, but the injury amounted to more than a mere loss of the leg or partial loss of the use of the leg. As set out in *Meadowlake,* the injured employee fell and "seriously injured her hip." As a result of the accident, the rounded upper end of the claimant's left femur was surgically removed and replaced with a prosthetic knob. Even though the injury in *Meadowlake* could well have been considered as related to the body as a whole rather than a scheduled injury, the opinion indicates that the Commission made an award for total disability, as in *McNeely,* for the duration or permanency of the disability in *Meadowlake* is not mentioned.

I am growing weary of writing useless dissents in workmen's compensation cases; consequently, until the Legislature or this court again changes the law, I shall accept the majority opinion in this case as simply holding that when the Workmen's Compensation Commission awards *permanent*

and *total* disability as a result of scheduled permanent injury under § 81-1313 (c), I shall feel obligated to affirm the Commission if there is any substantial evidence to support the award.

We said in *Anchor Constr. Co., supra,* that an injury scheduled under subsection (c) could not be apportioned to the body as a whole in determining the extent of permanent partial disability as distinguished from permanent total disability. We also said in *Anchor* that the Commission cannot consider wage earning loss in addition to functional loss in fixing partial loss or partial loss of use under subsection (c). But apparently, under the majority opinion in the case at bar, the Commission may relate a scheduled injury to the body as a whole, and may also consider wage earning loss in addition to functional loss if the Commission is considering *permanent* total disability rather than *temporary* total or permanent *partial* disability.

I would reverse and direct that this case be remanded to the Commission for a determination and award under subsection (c), and for determination and award of any additional *total* disability from which the claimant may be suffering at the present time, and for any medical services to which the claimant may be entitled.