Cite as 2022 Ark. App. 60

# ARKANSAS COURT OF APPEALS
## DIVISIONS II & III
### No. CV-21-239

BILLY CORLEY

APPELLANT

V.

ACME BRICK

APPELLEE

Opinion Delivered FEBRUARY 9, 2022

APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION
[NO. G808515]

REVERSED AND REMANDED

## ROBERT J. GLADWIN, Judge

Billy Corley appeals the February 10, 2021 decision of the Arkansas Workers' Compensation Commission (Commission), which found that Corley did not prove he sustained an unscheduled compensable injury and that he is not entitled to a whole-body permanent-impairment rating. He argues on appeal that the Commission erred in holding that his injury was a scheduled one and that he is not entitled to wage-loss disability benefits. Alternatively, he contends that his impairment rating should be applied to the leg at or above the knee. We reverse the Commission's finding that Corley sustained a scheduled injury and remand for further proceedings.

### I. *Statement of Facts*

On November 21, 2018, Corley suffered a compensable injury while working for appellee Acme Brick (Acme) when he fell through a catwalk and injured his hip, leg, arm, and shoulder. He reached maximum medical improvement on October 15, 2019, and he

was assessed a fifty-percent rating to his right lower extremity. When Corley sought a whole-body impairment rating, Acme objected, and the issue was presented to the Commission.

Corley's medical records reflect that on November 22, 2018, he went to the emergency room as a result of the injury he had sustained the day before from falling through the broken catwalk. The physician's assistant (PA) noted, "He states that he had a large amount of swelling around the right lower leg afterwards with some redness and bruising. Pain is from the right knee and radiates down into the lower leg and into the ankle." The PA noted that the physical examination showed swelling in the right knee and ankle and that Corley had "diffuse tenderness to palpation of right lower leg from knee to ankle."

On February 15, 2019, Corley was examined by Dr. Justin Clayton, who noted that Corley's MRI revealed some significant edema, "either fat necrosis or hemorrhage laterally at the fibula." He referred Corley to the lymphedema clinic, and on February 26, the occupational therapist's primary diagnosis was "lymphedema of right lower extremity." The therapist observed that Corley's "knee and thigh are 19.6 cm larger on the right than on the left" and that his "lower leg and foot/ankle are 32.4 cm larger on the right than on the left." On March 11, the therapist noted that Corley's right thigh had a marked decrease in edema but showed an increase in swelling below the knee. After several months of therapy, the swelling in Corley's ankle and lower leg also began to decrease. However, on June 25, the therapist observed an increase in edema "throughout whole right lower extremity including his knee and hip."

According to the therapist's notes dated August 26, Corley saw Dr. Trent Johnson on July 11, a cast was placed below Corley's knee, and it remained for three weeks until August 7. On August 20, Corley was examined by Dr. Clayton, and his chief complaint was right leg pain. The doctor noted that Corley had edema in his right lower extremity "up to about his knee." The doctor's assessment was that Corley had

> lymphedema after a significant injury. I was not able to palpate any obvious fluid collections. I am not sure that any sort of surgical intervention at this point is going to be especially helpful. I think revisiting the lymphedema clinic is probably the best option with wound care as needed. Once he has gotten back into the lymphedema clinic, it might not be unreasonable to re-image his leg, but this is likely going to result in some sort of long-term disability.

On September 18, Dr. Clayton noted, "I think at this point he has gotten as much improvement from my services as he can get. I anticipate that he will need lymphedema treatments indefinitely."

A functional capacity evaluation (FCE) was done on September 26, and it was found that Corley gave a consistent effort. He demonstrated an occasional lift/carry of up to twenty pounds but did not demonstrate the ability to do so on a frequent basis due to his low tolerance to standing and walking. The results of the FCE indicated that Corley is able to perform in the sedentary classification. The evaluator noted that Corley had edema present throughout his right lower extremity "from just above the knee to his toes." Finally, Dr. Clayton agreed, "The guides recommend using the section that provides the greater impairment. In Mr. Corley's case, the impairment for his peripheral vascular disorder is the greatest and results in an 20% Whole Person, 50% Lower Extremity impairment for his work-related right injury."

3

Dr. Clayton wrote on October 16 that Corley had reached maximum medical improvement on October 15, 2019, with an impairment of 50 percent of the lower extremity and 20 percent of the whole person based on the *AMA Guides to the Evaluation of Permanent Impairment* (AMA Guides). He recommended that Corley continue lymphedema treatments indefinitely and referred him back to Dr. Holder for monitoring of the lymphedema as needed.

At the July 28, 2020 hearing before the administrative law judge (ALJ), Bonnie Corley testified that she is Corley's wife of forty years and had been an LPN for sixteen years. She said that before his compensable injury in November 2018, Corley suffered from diabetes and neuropathy, but those conditions did not limit his activities. She described having witnessed Corley's lymphedema therapy sessions following his injury and said that the therapist made a circular pushing motion beginning at his neck and working down through his shoulders and sides then continued from his back into his groin area. She said that after a cast was put on his right leg, she observed swelling in Corley's right leg, hip, groin area, and left leg. She said that he has had several falls since the accident and that he is no longer able to play ball with their grandchildren. He is too tired to do much of anything, and the therapy wears him out. He wears compression hose, but nothing is able to control his swelling. She said that before his accident, Corley did not complain of swelling and that she never saw his feet swell. She said that he had taken pain medication for his arthritis and that his job had included heavy labor and walking up and down sixteen flights of steps several times a day. She said that before the accident, he would be tired but not worn out.

4

Corley testified that he was injured on November 21, 2018, and he said,

> Early in the morning, I walk the catwalk to turn on the conveyor belt to run the material. What I walk on is like galvanized steel. It gave way and I went down in it. I fell all the way, the ankle and knee down in there and my leg, hip, arm and shoulder hit up against the frame. . . . The injury was described as a degloving.

Corley described the extent of the physical labor he had performed in his job for Acme. He said that it was normal for him to take pain medication because of the physical work, that he began having arthritis pain in his arms and shoulders, and that it was just part of the job that he dealt with. He said,

> I worked for thirty-five years. I had very few missed days. I wanted to get back to work. I think it was December 17 of 2018; I couldn't work no more so they laid me off. Dr. Holder did. I did everything the doctor, the physical therapist and the lymphotherapist asked me to do to try and get back to work.

> After my injury, I can hardly do anything because I'm tired all the time. I hurt constantly. I hurt constantly back then when I worked, but this is a different kind of hurt. I've heard the lymphedema is poisoning my system and my leg and everything else. I done a lot of hard work; but, where I worked at, you have to overcome the pain as much as possible. The difference now is that I can't hardly move around or walk anymore.

> I am sixty-two years old, and I went to the ninth grade in school. My condition is that I can't walk right. I have no balance. I don't think I'll be able to return to work.

On cross-examination, Corley said that he had a little swelling in his leg prior to his accident and that it was normal "when you're on your feet ten to twelve hours a day." On May 4, 2018, he was diagnosed with chronic gout in his right knee, but he said that it did not affect his job. He guessed he was diagnosed with diabetes around 2005 and said that he takes insulin. He said that his diabetes is under control and that it had caused some neuropathy in his left leg. He said that the accident caused a little neuropathy in his right leg and that he had peripheral diabetic neuropathy before the accident, but "it was in my

5

left and that is why I was taking Lyrica." He said that he had pain before his accident because of his work, "but nothing like this."

The ALJ issued an opinion on October 5, 2020, finding that Corley had proved by a preponderance of the evidence that he is entitled to a 20 percent anatomical impairment rating to the body as a whole and that he is entitled to wage loss in the amount of forty-five percent. The ALJ found that Corley's main injury was to his right leg and that he developed lymphedema, which is a compensable consequence of his injury. The ALJ's opinion states:

> Certainly, the claimant's authorized treating surgeon made a referral for lymphotherapy. Dr. Clayton in February 2019 noted that the claimant did not have an orthopedic issue but needed treatment in a lymphedema clinic. Based on a review of the evidence, it appears Dr. Clayton felt that the lasting effect of the claimant's right knee injury was not orthopedic, but a systematic lymphedema. Dr. Clayton assessed a 20% impairment rating to the claimant's body as a whole. Such an impairment rating refers to the anatomical loss to injury. The claimant's impairment is expressed in a numerical percentage of loss of the body based on the opinion of a physician, Arkansas Code Annotated § 11-9-519, et al. The assessment of anatomical impairment must also be based on the AMA Guides to Evaluation of Permanent Impairment, 4th Edition (hereinafter AMA Guides). Based on a review of the AMA Guides, lymphedema is discussed under the section referring to vascular diseases affecting the extremities. The proper table to use in this assessment is Table 14. That table sets impairment ratings to the body as a whole, not to the extremity. Since the claimant developed lymphedema as a consequence of his injury, a rating to the body as a whole is appropriate, not simply a rating to the lower extremity alone. The AMA Guides' assessment using Table 14 is consistent with the assessment of Dr. Clayton in assigning the claimant a 20% impairment rating to the body as whole. It should be noted that Dr. Clayton also assigned the claimant a 50% rating to the lower extremity in that same November 20, 2019 report. The respondents contend that the claimant is entitled to the 50% rating to the lower extremity and therefore also not entitled to any wage loss disability. It would be unreasonable based on a review of the medical records and the claimant's treatment to think that the claimant was being treated solely for a lower extremity injury when there is no question that the claimant suffered issues with other areas of his body due to the consequence of the lymphedema. The claimant also noted that he feels tired all the time and thinks the lymphedema may be poisoning his system. However, I find an assessment based on the AMA Guides, Table 14 and Dr. Clayton's whole-body assessment is correct. The claimant has proven that he is entitled to the 20% impairment to the body as a whole assessed by Dr. Clayton.

The ALJ also found that Corley was entitled to wage-loss benefits in the amount of 45 percent in addition to the 20 percent anatomical-impairment rating.

Acme appealed, and the Commission issued its opinion on February 10, 2021, reversing the ALJ's decision. The Commission wrote,

> The parties stipulated in the present matter that the claimant sustained a compensable injury on November 21, 2018. The probative evidence demonstrates that the claimant sustained a compensable scheduled injury to his right lower extremity. It was reported at Mercy Clinic on November 22, 2018 that the claimant injured his right leg when he fell through the catwalk. It was noted, "Pain is from right knee and radiates down into the lower leg and into the ankle." A physician's assistant reported swelling in the claimant's right knee, right ankle, and right lower leg. Dr. Clayton reported on February 15, 2019 that the compensable injury caused "swelling over the lateral aspect of his ankle. . . . He has significant edema, especially laterally along the distal third of his fibula." The record does not show that the claimant sustained a compensable injury above his right knee; nor does the record show that the claimant sustained a compensable injury to any unscheduled anatomic region.

> Dr. Clayton referred the claimant to an occupational therapist, Christine A. Capeheart. Ms. Capehart's Primary Diagnosis on February 26, 2019, was "Lymphedema of right lower extremity." Stedman's Medical Dictionary, 26th Edition, defines "Lymphedema" as "Swelling (especially in subcutaneous tissues) as a result of obstruction of lymphatic vessels or lymph nodes and the accumulation of large amounts of lymph in the affected region." The preponderance of evidence supports the administrative law judge's determination that the claimant sustained lymphedema as a natural consequence of his compensable scheduled injury. *See Hubley v. Best Western Governor's Inn*, 52 Ark. App. 226, 916 S.W.2d 143 (1996). Nevertheless, the claimant's treatment for lymphedema does not convert his compensable scheduled injury to an unscheduled injury.

> . . . .

> The evidence does not demonstrate that massage of the claimant's neck, shoulders, feet, or other areas indicates that the claimant sustained a compensable unscheduled, whole-body injury. The probative evidence of record demonstrates that the claimant sustained a compensable scheduled injury to his right lower extremity. A claimant who sustains a scheduled injury is limited to the applicable allowances set forth in Ark. Code Ann. § 11-9-521 (Repl. 2012), and such benefits

7

cannot be increased by considering wage-loss factors absent a finding of permanent total disability.

After reviewing the entire record de novo, the Full Commission reverses the administrative law judge's finding that the claimant proved he sustained wage-loss disability in the amount of 45%. The Full Commission finds that the claimant sustained a compensable scheduled injury to his right lower extremity. The Full Commission finds that the claimant did not sustain an unscheduled injury, and we find that the diagnosis and treatment of lymphedema did not convert the claimant's compensable scheduled injury to an unscheduled injury. The claimant is limited to the applicable allowances set forth in Ark. Code Ann. § 11-9-521 (Repl. 2012). The claimant to date does not claim that he is permanently totally disabled. The claim for wage-loss disability is respectfully denied and dismissed.

From this decision, Corley filed a timely notice of appeal, and this appeal followed.

II. *Applicable Law and Standard of Review*

Arkansas Code Annotated section 11-9-521(a) (Repl. 2012) provides that an injured employee shall receive weekly benefits for scheduled permanent compensable injuries sustained by the employee in addition to compensation for temporary total and temporary partial benefits during the healing period or until the employee returns to work, whichever occurs first.  For example, the scheduled list includes 184 weeks of benefits for "[l]eg amputated at the knee, or between the knee and the hip" and 131 weeks of benefits for "[l]eg amputated between the knee and the ankle."  Ark. Code Ann. § 11-9-521(a)(3) & (4).  Arkansas Code Annotated section 11-9-522(a) (Repl. 2012) provides that an unscheduled injury shall be apportioned to the body as a whole and shall have a value of 450 weeks.

When reviewing a decision of the Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission. *Ark. Dep't of Parks & Tourism v. Price*, 2016 Ark. App. 109, 483 S.W.3d 320.

This court must affirm the decision of the Commission if it is supported by substantial evidence. *Id*. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion of the Commission. *Id*. We reverse the Commission's decision only if we are convinced that fair-minded persons could not have reached the same conclusion with the same facts before them. *Id*. Questions regarding the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Id*.

> The Commission has the authority to accept or reject medical opinions and its resolution of the medical evidence has the force and effect of a jury verdict. *Coleman v. Pro Transp., Inc.*, 97 Ark. App. 338, 249 S.W.3d 149 (2007). The Commission, however, may not arbitrarily disregard medical evidence. *Pyle v. Woodfield, Inc.*, 2009 Ark. App. 251, 306 S.W.3d 455. In order for an administrative action to be invalid as arbitrary, the action must either lack any rational basis or hinge on a finding of fact based on an erroneous view of the law. *Pine Bluff for Safe Disposal v. Ark. Pollution Control & Ecology Comm'n*, 354 Ark. 563, 127 S.W.3d 509 (2003); *Ark. Prof'l Bail Bondsman Licensing Bd. v. Oudin*, 348 Ark. 48, 69 S.W.3d 855 (2002). An arbitrary act is thus an illegal or unreasoned act; an act is not arbitrary simply because the reviewing court would have acted differently. *Woodyard v. Ark. Diversified Ins. Co.*, 268 Ark. 94, 594 S.W.2d 13 (1980). In workers'-compensation cases, arbitrary disregard of evidence is demonstrated when the Commission affirmatively states that there is "no evidence" for a proposition when such evidence has, in fact, been presented in the proceeding. *See Edens v. Superior Marble & Glass*, 346 Ark. 487, 58 S.W.3d 369 (2001).

*Lonoke Exceptional Sch., Inc. v. Coffman*, 2019 Ark. App. 80, at 3–4, 569 S.W.3d 378, 381.

In *Milburn v. Concrete Fabricators, Inc.*, 18 Ark. App. 23, 25–26, 709 S.W.2d 822, 823 (1986), we reversed the Commission's finding of a scheduled injury and stated,

> We believe the evidence is conclusive that appellant sustained a hip injury attributable to his broken leg. Although a scheduled injury cannot be apportioned to the body as a whole absent total disability, *Anchor Construction Co. v. Rice*, 252 Ark. 460, 479 S.W.2d 573 (1972), the Arkansas Supreme Court held in *Clark v. Shiloh Tank & Erection Co.*, 259 Ark. 521, 534 S.W.2d 240 (1976), that a claimant who had received a scheduled injury could receive additional compensation for an injury which was found to be attributable to the scheduled injury.

9

In *Taylor v. Pfeiffer Plumbing & Heating Co.*, 8 Ark. App. 144, 648 S.W.2d 526 (1983), we reversed a finding that a claimant's shoulder injury was a scheduled injury and held that it was an unscheduled injury which should have been apportioned to the body as a whole. We also said this was primarily a question of law and even if the effects of the shoulder injury extended into the claimant's arm, this would not make the injury a scheduled one.

Arkansas Statutes Annotated Section 81–1313(c)(3) (Repl.1976) [replaced by section 11-9-521], provides scheduled injury payments for a "leg amputated at the knee, or between the knee and the hip." It is clear that the appellant's problem is not between the hip and the knee. While medically speaking, a hip may be considered a part of the leg, from a legal point of view, a hip injury is an injury to the body as a whole under the Workers' Compensation Law.

Both parties agree that the question of whether an impairment rating should be assessed to the body as a whole is one of law. *Taylor, supra.*

III. *Scheduled Injury vs. Unscheduled Injury*

Corley argues that the Commission erred as a matter of law in holding that his injury was scheduled. He contends that there is no dispute that he developed lymphedema as a result of his compensable accident; rather, the dispute is whether lymphedema is a scheduled injury under the statute. Ark. Code Ann. § 11-9-521. He argues that his medical records indicate that lymphedema is a vascular disease and a disorder, neither of which are listed in the statute. Further, he emphasizes that the FCE report refers to the *AMA Guides* related to vascular disorders in assessing the 20 percent impairment rating to the body as a whole.

Acme states that a preponderance of evidence supports that Corley sustained lymphedema as a natural consequence of the compensable scheduled injury. *Hubley v. Best Western Governor's Inn*, 52 Ark. App. 226, 916 S.W.2d 143 (1996). Nevertheless, Acme

claims that the treatment for lymphedema does not convert Corley's scheduled injury to an unscheduled injury.[1]

Although we do not agree with Corley's argument that he sustained an injury to his entire lymphatic system, we hold that the Commission's determination that Corley's injury is scheduled is in error. The Commission relies on Corley's wife's testimony that the swelling in his hip occurred after the cast had been placed, but the record shows that the cast was placed in July 2019, which was after the noted hip swelling in June 2019. The occupational therapist measured Corley's leg on February 26, 2019, and his right thigh, knee, and lower leg were swollen as compared to the left leg. On June 25, 2019, there was swelling in his right hip and thigh, as observed by the therapist.

The Commission relies on the definition of lymphedema as swelling "in the affected region." The affected region as evidenced by the medical records includes swelling in the area above Corley's knee, including his hip. The lymphedema affected his entire right leg and hip, which is not listed in section 11-9-521, and therefore is unscheduled. *See Milburn*, *supra*. Accordingly, the Commission's determination that Corley sustained a scheduled injury is erroneous. A permanent partial disability that is not scheduled in Arkansas Code Annotated section 521 shall be apportioned to the body as a whole. Ark. Code Ann. § 11-9-522(a).

---

[1]Acme urges that *Wilson v. Jennifer Construction Co.*, No. CA05-1213 (Ark. App. Oct. 25, 2006) (unpublished) is dispositive. In this case, we affirmed the Commission's decision that the claimant was not entitled to an impairment rating based on the body as a whole when an independent doctor's evaluation "conceded that the chronic lymphedema and the DVT should be rated to the right lower extremity." Rule 5-2(c) (2021) of the Arkansas Supreme Court and Court of Appeals provides that unpublished opinions issued before July 1, 2009, shall not be cited, quoted, or referred to in arguments presented to any court.

Because we reverse the Commission's decision that Corley sustained a scheduled injury, we do not address Corley's alternative argument. Therefore, we reverse and remand this case to the Commission for an award based on a whole-body impairment and for a determination of wage-loss disability.

Reversed and remanded.

ABRAMSON, VIRDEN, and WHITEAKER, JJ., agree.

KLAPPENBACH and HIXSON, JJ., dissent.

**KENNETH S. HIXSON, Judge, dissenting**. The claimant, Billy Corley, sustained a serious injury to his right lower extremity. The respondent accepted the claim as compensable, accepted a 50 percent permanent partial-disability rating to his right lower extremity, and began making the disability payments. With nothing to lose, the claimant continued his claim alleging that his injury was nonscheduled to the body as a whole and that he was entitled to wage-loss benefits. The claimant had the burden to prove that he sustained a permanent injury that was not a scheduled injury. The claimant elected to prosecute his claim without the benefit of any medical testimony. A major problem in this case is that the claimant did not introduce any testimony from Dr. Justin Clayton or from his occupational therapist, Christine Capehart. Therefore, we are left to analyze and interpret contemporary medical notes and records without any benefit of explanations from medical professionals. The majority holds that the claimant sustained an injury to the body as a whole because the claimant suffered from swelling in his knee, thigh, and hip. I disagree and respectfully dissent.

The majority opinion goes to great lengths to explain that the swelling in the claimant's knee, thigh, and hip renders this injury to his right lower extremity an injury to the body as a whole. However, the majority opinion omits any discussion of the threshold requirement that the claimant sustained a *permanent* injury to this area. Arkansas Code Annotated section 11-9-522(a) (Repl. 2012) provides the following: "A permanent partial disability not scheduled in § 11-9-521 shall be apportioned to the body as a whole, which shall have a value of four hundred fifty (450) weeks, and there shall be paid compensation to the injured employee for the proportionate loss of use of the body as a whole resulting from the injury." That begs the question: what is the medical evidence that the claimant sustained a *permanent* injury to his right knee, thigh, or hip?

The claimant fell, severely injuring his lower right leg. During the fall, the claimant's right leg, hip, arm, and shoulder struck the collapsed catwalk frame. During Corley's healing period, in addition to the degloving injury to his right lower extremity, he incurred swelling in his lower right extremity, right knee, thigh, and hip area. This swelling is referred to in the records as lymphedema. There is no medical evidence in the record that explains lymphedema or whether lymphedema is a temporary or permanent condition. The common treatment for lymphedema is manual lymphatic drainage (MLD). MLD is generally defined in medical parlance as a light—but very specific—hands-on therapy designed to reduce lymph swelling by enhancing lymphatic drainage. MLD therapists are trained in the anatomy and physiology of the lymphatic system to facilitate lymph drainage of the vessels. Generally, MLD is a gentle massage that hopefully increases blood circulation, which assists the body in diffusing the swelling. There are references in the record where

13

the therapist used MLD on most, if not all, visits, and the claimant's wife also testified that she massaged the claimant's neck, shoulders, and back as an at-home informal MLD treatment.

The claimant was seen by an orthopedic doctor, Dr. Justin Clayton. Very early in Dr. Clayton's treatment plan, Dr. Clayton recognized that Corley's injury was not orthopedic in nature and referred Corley for occupational therapy for treatment of the lymphedema and open wounds. The occupational therapist was Christine Capehart, and most of the medical information in our record comes from her notes.

Occupational therapist Capehart's records indicate that from February 26, 2019, through October 29, 2019, she treated the claimant on thirty-five visits. Ms. Capehart's contemporary treatment notes reveal she was primarily treating the claimant's open wounds and lymphedema in his right lower extremity. However, during the early stages of treatment, Ms. Capehart did note that the claimant had swelling in his right knee, thigh, and hip, and she treated that area with MLD. The medical records are clear that the MLD treatment of his lymphedema in his right knee, thigh, and hip was successful, and this lymphedema was resolved during treatment. A review of her treatment notes indicates that by March 22, 2019 (visit five), he had "continued control of edema in thigh and knee." Then, on March 26 (visit six), Ms. Capehart notes that "[the claimant] continues to have no complaints of (R) [right] knee or thigh edema," and on March 28 (visit seven), the notes indicate "skin has [returned to] normal mobility and stretch above the knee." So, the contemporaneous occupational-therapy records indicate that the swelling above the claimant's knee had resolved by late March 2019, and in fact, the skin above the knee

14

returned to normal mobility and stretch. Ms. Capehart continued to treat the claimant twenty-six more times. In one medical record dated June 25 (visit nineteen), the therapist observed an increase in edema "throughout whole (R) LE [right lower extremity] including his knee and hip." However, Ms. Capehart treated the claimant another sixteen visits, and the June 25 entry is the lone entry in these medical records concerning edema above the right lower extremity. In fact, in most of the subsequent visits, Ms. Capehart meticulously measured the circumference of the claimant's right lower extremity for comparison with previous measurements, but Ms. Capehart never measured the circumference of his right thigh after the lone June 25 visit.

What other medical evidence discusses the claimant's swelling to his right knee, thigh, and hip after the March 28 note in which occupational therapist Capehart noted the claimant had no complaints to that area? Dr. Clayton's September 19, 2019, clinic progress notes provide in pertinent part:

> HISTORY: This is a patient . . . who sustained a significant injury to his right lower extremity. The patient has had persistent swelling and pain in the right lower extremity that has responded somewhat to lymphedema treatments but he has recurrent problems. . . . ASSESSMENT AND PLAN: Lymphedema right lower extremity, traumatic in origin. I think at this point he has gotten as much improvement from my services as he can get. I anticipate he will need lymphedema treatments indefinitely. Patient will need a functional capacity evaluation as well as an impairment rating.

Hence, Dr. Clayton does not note any injury or medical condition to the claimant's knee, thigh, or hip and certainly no permanent injury to that area.

On September 26, 2019, Corley underwent a functional capacity evaluation, and the report states the following in pertinent part:

15

PURPOSE OF ASSESSMENT . . . Mr. Corley is referred with complaints of on-going edema and pain in his right lower leg which he attributes to injuries he sustained in a work-related accident.

. . . .

Injury Diagnosis:  Leg, Lower, Right, Pain, Morel Lesion – RLE.

. . . .

Mr. Corley reports that he was injured while working when he stepped through a catwalk and injured his RLE.  He states that he has some swelling in his right leg *from his knee to his ankle that did not improve.* . . . He states that he made no progress in therapy and he states that his doctors have been unable to adequately control the edema in his RLE especially below the knee.

. . . .

Mr. Corley states that he has a home unit as well that he uses 1-2 time daily for his chronic swelling in his RLE.

. . . .

Mr. Corley rates his RLE pain as a going from moderate to severe depending on activity and position.

. . . .

Intake Interview Observations: . . . Mr. Corley arrived wearing a neoprene wrap from his toe regions up to just below the knee on the right.

. . . .

Comments for walking: . . . [Mr. Corley] was asked to begin the evaluation without the compression brace but after these trials there was measurable increased girth from the calf down so he was instructed to wear the wrap/brace.  He states that he uses a cane for balance and he is occasionally unsteady on his feet.

. . . .

Comments for Crouching: Mr. Corley did not demonstrate the ability to do this task because of his RLE condition.

. . . .

Comments for Prolonged Walking: . . . [Mr. Corley] requested to rest frequently and his RLE did have significantly increased edema above his wrap on the RLE.

. . . .

Comments for Balance: . . . [Mr. Corley] does have decreased balance related to his RLE condition.

. . . .

3.2m Peripheral Vascular Disorders, Table 69 (p. 89): Mr. Corley does have marked edema that is only partial controlled by elastic supports. His medical records and diagnostic testing does indicate *a Morel Lesion of the RLE*. On examination today, Mr. Corley's *edema in his RLE* is significantly increased at rest as compared to his contralateral side. . . . His condition is a Class 3 impairment with a *lower extremity impairment of 50%.*

Other pertinent information:
There was *significant edema present at both the medical and lateral joint lines of the right ankle.* . . . He does [have] *edema present throughout the RLE from just above the knee to his toes.* He does have congenital varus of the right knee. . . .

(Emphasis added.) That is the extent of the medical evidence with respect to edema or swelling above the claimant's right lower extremity. Back to the original question: Where is the medical evidence that supports a finding that the claimant sustained a permanent injury to his right knee, thigh, or hip?

I agree with the majority that the determination of whether a *permanent* injury is scheduled or nonscheduled is a question of law. *See Taylor v. Pfeiffer Plumbing & Heating Co.*, 8 Ark. App. 144, 648 S.W.2d 526 (1983). However, the determination of whether the claimant sustained a *permanent* injury is within the purview of the Full Commission on the basis of the evidence presented. We have long held that it is within the Commission's province to reconcile conflicting evidence, including medical evidence. *Tempworks Mgmt. Servs., Inc. v. Jaynes*, 2020 Ark. App. 70, 593 S.W.3d 519. The Commission has the duty

of weighing medical evidence, and the resolution of conflicting evidence is a question of fact for the Commission. *Id.* Armed with this record, the Full Commission determined:

> The evidence does not demonstrate that massage of the claimant's neck, shoulders, feet or other areas indicates that the claimant sustained an unscheduled, whole-body injury. The probative evidence demonstrates that the claimant sustained a compensable scheduled injury to his right lower extremity. . . .
>
> After reviewing the entire record de novo, . . . [t]he Full Commission finds that the claimant did not sustain an unscheduled injury, and *we find that the diagnosis and treatment of lymphedema did not convert the claimant's compensable scheduled injury to an unscheduled injury.*

The Commission also stated,

> The preponderance of the evidence supports the administrative law judge's determination that the claimant sustained lymphedema as a natural consequence of his compensable scheduled injury. . . . *Nevertheless, the claimant's treatment for lymphedema does not convert his compensable scheduled injury to an unscheduled injury.*

(Emphasis added.)

As mentioned earlier, the problem in this case is the medical evidence, or perhaps better said, the paucity of medical evidence. The claimant's injury occurred on November 21, 2018. The claimant reached maximum medical improvement (MMI) on October 15, 2019. The claimant received temporary disability benefits during this time period. When a claimant reaches MMI, the character of disability compensation changes from temporary disability to permanent disability benefits. There is a major distinction between compensation for temporary disability and permanent disability. Temporary disability benefits are awarded for the time period during which the claimant is still healing and has not reached MMI and is unable to work.[1] For a short time during this temporary disability

---

[1]I acknowledge that temporary partial-disability payments are sometimes awarded, but that topic is not relevant to this discussion.

18

period, the claimant did suffer from swelling to his right knee, thigh, and hip. However, we have previously defined "permanent impairment" as "any permanent functional or anatomical loss remaining after the healing period has ended." *Ark. State Military Dep't v. Jackson*, 2019 Ark. App. 92, at 9, 568 S.W.3d 811, 817 (quoting *Main v. Metals*, 2010 Ark. App. 585, at 9, 377 S.W.3d 506, 511). Under the statute, any determination of the existence or extent of physical impairment must be supported by objective and measurable findings. Ark. Code Ann. § 11-9-704I(1)(B) (Repl. 2012). In other words, permanent disability benefits are determined and awarded at a specific point in time and are forward looking, i.e., when the claimant has reached MMI. When the claimant reaches MMI, a snapshot is taken of the current medical condition of the claimant from a permanency perspective. How is the claimant's injury going to affect him in the future? The permanent-disability determination is made at the time of MMI. So, the appropriate query is what was the medical condition of the claimant at MMI. The medical records cited above clearly indicate that the swelling above the claimant's knee resolved by March 28, 2019. A brief recurrence was noted on June 25. After that date, there is no mention of swelling above his knee.

As such, I can find no authority for determining that the claimant's compensable injury to this right lower extremity is a nonscheduled permanent injury due to transitory medical conditions that appeared and resolved during the healing period. Here, the Commission found that the claimant's injury was a scheduled injury to the right lower extremity as set forth in subsection (4) of Arkansas Code Annotated section 11-9-521(a) because it was a loss between his knee and ankle. As such, the Commission accepted the

impairment recommendation of Dr. Clayton as a 50 percent permanent impairment to the lower right extremity, which represents an award of 50 percent of 131 weeks.

I disagree with the majority opinion for another reason. Assuming arguendo that the claimant did have lymphedema in his right knee and thigh at MMI and that it was medically permanent, the majority holds that such a medical condition changes the scheduled injury to the right lower extremity to an injury to the body as a whole. I can find no authority for such a transformation. Even if the claimant had lymphedema in his right thigh and knee, the most he could claim is a scheduled injury to his entire leg under subsection (3) of Arkansas Code Annotated section 11-9-521(a). This would allow his permanent partial-disability compensation to be prorated from 184 weeks instead of 131 weeks. Under no circumstances would the character of the claim change from a scheduled injury to a nonscheduled injury to the body as a whole accompanied by wage loss compensation.[2]

Thus, I would affirm. The claimant sustained a 50 percent permanent partial disability to his right lower extremity as found by the Commission.

KLAPPENBACH, J., joins.

*Walker Law Group, PLC*, by: *Eddie H. Walker, Jr.*, for appellant.

*Spicer Rudstrom, PLLC*, by: *Amy C. Markham*, for appellee.

---

[2]I agree with the majority that a permanent injury to the hip is a nonscheduled injury. However, for the same reasons as set forth above, there is no evidence of a permanent injury to the claimant's hip; therefore, the claimant's injury under these circumstances remains a scheduled injury.